FILED
2026 Sep-11 PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **THE RIGHT REVEREND JULIAN M. DOBBS, an individual,**<br><br>***Plaintiff***<br><br>***v.***<br><br>**THE RIGHT REVEREND DEREK L.S. JONES, *individually and as agent of the Jurisdiction of the Armed Forces and Chaplaincy*; and JURISDICTION OF THE ARMED FORCES AND CHAPLAINCY,**<br><br>***Defendants*** | **Case No.: 2:26-cv-00267-MHH** |

**MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS**

## MAY IT PLEASE THE COURT:

In support of the Motion for Sanctions filed by Plaintiff, The Right Reverend Julian M. Dobbs ("Bishop Dobbs"), Bishop Dobbs respectfully shows as follows:

## I. INTRODUCTION

Defendants' Motion to Dismiss depends centrally on the premise that the September 22, 2025 Teams meeting was a closed, private, confidential church meeting, intended only for JAFC chaplains and never intended for public dissemination. [*See, e.g.,* R. Doc. 7 at p. 4 ("The meeting was confidential and internal to JAFC - closed to the public, confirmed confidential on the record, noticed only through JAFC's internal Chaplains list, and restricted at entry to JAFC Chaplain email addresses."); *see also* R. Doc. 9 (Decl. of Bishop Jones) at p. 4, ¶ 15 ("The meeting was a closed,

internal meeting of the church; it was not open to the public. Indeed, at the very beginning of the meeting, I confirmed for the record that the meeting was meant to be confidential."), at p. 6-7, ¶ 25 ("I did not intend, authorize, or request that the meeting, my remarks, or any recording of the meeting be published to the public or to anyone outside the JAFC. It was exclusively intended for chaplains under my ecclesiastical and endorsement authority."), and at p. 7, ¶ 26 ("The first time I realized that the meeting was leaked from beyond the closed group of Anglican Chaplains was when I discovered that Plaintiff had filed this lawsuit.") These premises are false.

Obviously, given the focus of Bishop Jones' Declaration [R. Doc. 9], including repeated falsehoods over multiple paragraphs and pages, the lie that Defendants ever intended this matter to remain confidential or did, after the meeting, keep it confidential is central to Defendants' attempt to have this matter dismissed as involving private, internal church matters.

These statements are not merely inaccurate. They are material – indeed central – false factual assertions Defendants used to frame the Teams meeting as confidential, private, internal, *ecclesiastical*, and privileged. That framing permeates Defendants' jurisdictional and merits arguments. [*See* R. Doc. 7 at p. 2 (Defendants wrote the statements at issue fell into the category of statements made by Bishop Jones "to his own clergy during a closed, intra-church meeting"), at p. 14 ("Bishop Jones's statements to JAFC ministers occurred during a private, internal church meeting convened by Bishop Jones to address ACNA's Inhibition and to reaffirm his ministry over JAFC."), at p. 35 ("The all-hands statements were made when litigation was already under serious, good-faith consideration - as the presence of JAFC's counsel confirms…" further asserting they were made "during the September 22, 2025 all-hands meeting" and were "communications preliminary to litigation that JAFC was already seriously and in good faith contemplating against ACNA.").

While Bishop Dobbs submits herewith substantial additional evidence proving these assertions of intended confidentiality to be completely false, the Court actually need look no further than Bishop Jones' own remarks, contradicting his earlier prefatory statement that the meeting was confidential, made at about the 1:25:12 mark in the recorded meeting itself. He was asked by Father McElrath whether the information he shared could be shared outside of the meeting, and he (Bishop Jones) replied enthusiastically [*see* Exh. 1 at 01:25:12]: "You can share [what I've discussed on this call]. **I'm telling you this is a confidential meeting for you, but the information – I want it out there. [Repeating, with arms waiving wide seemingly indicating the breadth with which he wanted this information 'out there'] I want it out there. They need to be exposed for the liars they are.**" (emphasis added). Those words cannot be squared with Defendants' later *sworn* representations that Bishop Jones's statements were intended to remain confidential within the group invited to attend the meeting, nor within only church confines.

The undersigned has also gathered multiple eyewitness Declarations, under penalty of perjury, attesting to the video's posting to YouTube by Defendants and Defendants' explicit intent, at all times, that the information be publicly disseminated *outside of any purportedly 'confidential' 'ecclesiastical' meeting* (including to the news media). The Declarations of Father Lawrence McElrath, Bishop Marc Steele, Father Dan Morrison, and the undersigned (Marc J. Mandich) establish that JAFC leadership intended the recording to be distributed publicly, that Bishop Jones knew of and agreed with that plan, that the recording was posted publicly to JAFC's official YouTube channel, and that Defendants' counsel was given the publicly accessible JAFC YouTube link before the video was removed by the uploader (the JAFC) a day later, *while Defendants' counsel continued to distort truth in a heavy-handed letter asserting only the ACNA had the ability to take down the video and he was demanding the ACNA do so* (if that were true, how is it that

Defendants accessed the YouTube Channel and took the video down within the next two days? To ask this question is to answer it).[1] Compounding untruths only makes matters worse, Christian sermons discuss parables to that very effect. But if, in a hole, Defendants and their Counsel continue digging, only this Court can rectify the matter. Hence the present filing.

## II. RULE 11 STANDARD

Rule 11(b) provides that by presenting a written motion or other paper to the Court, an attorney certifies that, "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the filing is not presented for an improper purpose and its "factual contentions have evidentiary support." Fed. R. Civ. P. 11(b). If Rule 11(b) is violated, Rule 11(c)(1) permits the Court to impose "an appropriate sanction on any attorney, law firm, **or party** that violated the rule or is responsible for the violation," and absent exceptional circumstances, "a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Fed. R. Civ. P. 11(c)(1).

A Rule 11 sanctions motion must be made separately, must describe the specific conduct alleged to violate Rule 11(b), and must be served under Rule 5, but not filed if the challenged paper, claim, defense, contention, or denial is withdrawn or corrected within 21 days after service or within another time set by the Court. Fed. R. Civ. P. 11(c)(2). Plaintiff has complied with that safe-harbor requirement before filing this motion.[2]

---

[1] *See* Exhibit 2 (Defense Counsel's Aug. 15, 2026 Letter); Exhibit 3 (Declaration of Marc J. Mandich).

[2] In response to Plaintiff's August 20, 2026 compliance with Rule 11's Safe Harbor, Defense counsel sent Plaintiff's counsel a letter in response to the draft Rule 11 Motion around the end of business yesterday (September 10, 2026), the final day for the safe harbor. For completeness of the record and so the matter is fully laid before the Court, Plaintiff attaches Defendants' response letter [Exhibit 7] and Plaintiff's counsel's email response thereto [Exhibit 8]. Notably, Defendants do not directly contest Plaintiff's evidence that they intended Bishop Jones' comments on the Teams meeting to reach the general public or to be leaked to the media. They address only a few aspects of the many, independent false statements Jones made in his Declaration [R. Doc. 9]. Plaintiff's response to same is summarized

Rule 11(c)(4) provides that a sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and may include "nonmonetary directives," a penalty payable to the Court, or, "if imposed on motion and warranted for effective deterrence," an order requiring payment of "part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4).

The Supreme Court has explained "the central purpose of Rule 11 is to deter baseless filings in District Court." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Circuit-level decisions have further recognized that, to deter Rule 11 violations, a district court "may strike offensive pleadings" and may also "direct the offending party to pay the other party's reasonable attorney's fees." *See Divane v. Krull Elec. Co.*, 319 F.3d 307, 314 (7th Cir. 2003); and *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 400 (6th Cir. 2009) (observing that although Rule 11 is principally deterrent, "effective deterrence sometimes requires compensating the victim for attorney fees arising from abusive litigation").

## III. THE FALSE STATEMENTS AT ISSUE

The challenged statements fall into two categories: statements made in Defendants' Motion to Dismiss (filed, of course, under counsel's certification or oath of truthfulness), and statements made in Bishop Jones's Declaration submitted in support of that motion (which, pursuant to 28 U.S.C. § 1746, is made under penalty of perjury).

### A. Defendants' Motion to Dismiss [R. Doc. 7]

Defendants' Motion to Dismiss repeatedly represents the Teams meeting was – and was, at all times, intended to be – confidential, private, and internal. Defendants told the Court: "The

---

in Exh. 8 hereto. The thrust of Jones' falsehoods has not been countered, yet Defendants refused to withdraw the offending filings. Plaintiff will address their response further in reply briefing, as Plaintiff expects they will lodge the same arguments [Exh. 7] in their formal response to this Motion.

meeting was confidential and internal to JAFC - closed to the public, confirmed confidential on the record, noticed only through JAFC's internal Chaplains list, and restricted at entry to JAFC Chaplain email addresses." [R. Doc. 7 at p. 4]

Defendants further characterized the defamatory statements as occurring during "a closed, intra-church meeting." [*Id.* at p. 2] They argued "Bishop Jones's statements to JAFC ministers occurred during a private, internal church meeting convened by Bishop Jones to address ACNA's Inhibition and to reaffirm his ministry over JAFC." [*Id.* at p. 14] They also relied on the supposedly closed nature of the meeting to support their litigation privilege argument, asserting that the Teams meeting statements were "communications preliminary to litigation that JAFC was already seriously and in good faith contemplating against ACNA." [*Id.* at p. 35]

Those statements were material. Defendants used the alleged confidentiality of the meeting to support their ecclesiastical abstention argument, their litigation privilege argument, and their central-to-the-motion characterization of Bishop Jones's statements as private communications to his own clergy rather than defamatory statements intended for public dissemination.

**B. Bishop Jones' Declaration [R. Doc. 9]**

Bishop Jones's Declaration supporting Defendants' Motion repeats and expands the same false factual narrative. He declared under penalty of perjury: "The meeting was a closed, internal meeting of the church; it was not open to the public. Indeed, at the very beginning of the meeting, I confirmed for the record that the meeting was meant to be confidential." [R. Doc. 9 at p. 4 (¶ 15)]

He further represented his remarks "were not directed to the public" and declared: "I did not intend, authorize, or request that the meeting, my remarks, or any recording of the meeting be published to the public or to anyone outside the JAFC. It was exclusively intended for chaplains under my ecclesiastical and endorsement authority." [*Id.* at p. 6-7 (¶ 25)]

He goes on to assert, falsely and contrary to the video itself: "Even while I did everything I could to ensure that the meeting was private, I cannot prevent attending Anglican Chaplains from recording the meeting of their own prerogative, for instance by using their phone to record the meeting that they attended on their laptop." [*Id.*][3] [*see also* R. Doc. 9 at p. 6 (¶ 23) (contradicting himself in the very same Declaration, he states the meeting was recorded by the JAFC!)]

Finally, Bishop Jones also declared under penalty of perjury: "The first time I realized that the meeting was leaked from beyond the closed group of Anglican Chaplains was when I discovered that Plaintiff had filed this lawsuit." [R. Doc. 9 at p. 7 (¶ 26)]

These statements are directly contradicted by Bishop Jones's own words during the Teams meeting (*see* Exh. 1 at 01:25:12), by witnesses with personal knowledge, by contemporaneous documentary evidence supplied by one such witness, and by Defendants' public dissemination of the video on JAFC's own official YouTube channel.

## IV. EVIDENCE SHOWING THE MEETING WAS INTENDED FOR PUBLIC DISSEMINATION AND WAS PUBLICLY POSTED BY DEFENDANTS

### A. Bishop Jones' Own Statements During the Teams Meeting [EXHIBIT 1]

Before turning to the declarations, the Court need look no further than Bishop Jones's own statements during the Teams meeting. During the meeting, he was asked by Father McElrath whether the information he shared could be shared outside of the meeting, and he (Bishop Jones) replied [*see* Exh. 1 at 01:25:12]: "You can share [what I've discussed]. **I'm telling you this is a confidential meeting for you, but the information – I want it out there. [Repeating] I want it out there. They need to be exposed for the liars they are**." (emphasis added)

---

[3] *See* Exh. 1 to this Motion (clearly a screen recording, *not* a cellphone recording of a computer screen).

Those statements are powerful evidence of intended dissemination. A speaker who tells hundreds of attendees that he wants information "out there" and wants the people he is discussing "exposed" cannot, at least not credibly, later tell this Court the same statements were meant to remain confidential within the invited group.

Defendants' assertion is especially untenable in light of their public campaign to cause chaplains to view ACNA and Bishop Dobbs negatively and disassociate from them. While at this time, pre-discovery, Bishop Dobbs is unable to obtain the necessary evidence, he has good basis to believe both that (1) Bishop Jones expanded upon his statements in conversation with Ira Shapira of the Washington Post (Defendants' Motion filing at least admits he did give interview to the Washington Post and discussed his statements about Bishop Dobbs, which is hardly consistent with intent for these matters to remain internal and confidential; what is lacking at this time is evidence only discovery can provide that Defendants *provided the recorded statements* (among other things) to Mr. Shapira); and that (2) Defendants have been utilizing at least one reporter, David Virtue of VirtueOnline.org, not only to further *publicly* disseminate their false narrative and defamatory statements about Bishop Dobbs, but also to try to pressure Bishop Dobbs to dismiss his lawsuit. *See, e.g.,* David W. Virtue, DD, COMMENTARY, "ACNA SHOULD END THE LAWSUITS," VirtueOnline (Aug. 12, 2026).[4]

Bishop Dobbs' Complaint, on information and belief, alleges exactly such a public smear and pressure campaign, identifying the public-facing character of the meeting as part of Defendants' broader course of conduct. It alleges that after Bishop Jones's "bombshell" meeting, the allegations were widely disseminated in Anglican and secular press, requiring Bishop Dobbs, his Diocese's Standing Committee, ACNA, and ACNA leadership to respond publicly to

[4] Avail. at: https://www.virtueonline.org/post/acna-should-end-the-lawsuits (last vis. Aug. 18, 2026)

accusations made not only to Anglican clergy and faithful but to the wider public. Thus, in addition to the facts set out below and in the attached Declarations, Bishop Jones's own words on the Teams meeting, as well as circumstantial facts alleged by Bishop Dobbs, contradict the false assertion that the statements made during the meeting were intended to be kept confidential.

### B. Father Lawrence McElrath's Declaration [EXHIBIT 4]

Father McElrath served as Provost of the JAFC under Bishop Jones and participated in senior leadership discussions with Bishop Jones and other JAFC leaders. [Exh. 4 at ¶ 4] Father McElrath states he served as Provost of JAFC under Bishop Jones and was routinely involved in high-level discussions with Bishop Jones and JAFC senior leadership. [*Id.*] He further states he was involved in discussions before and after the Teams meeting in which Bishop Jones made the statements referenced in the Complaint. [*Id.* at ¶ 5]

Most importantly, Father McElrath states: "I specifically recall that Bishop Jones himself emphasized the need to have the Teams meeting recorded and either himself suggested or at the very least acquiesced in the JAFC leadership's suggestion that the recording be leaked to media contacts." [*Id.* at ¶ 7]

He also states: "All JAFC leadership were in agreement that the recorded meeting was to be distributed publicly so that Bishop Jones would have an opportunity to share his side of the story." [*Id.* at ¶ 8] And he confirms that after the meeting: "All JAFC leadership, including Bishop Jones, remained in agreement and remained intent on making the Teams meeting publicly available via the media." [*Id.* at ¶ 9]

Finally, Father McElrath also states that "The video recording was publicly posted by the JAFC to its YouTube Channel, 'Anglican Chaplains – JAFC.' [*Id.* at ¶ 10] These facts squarely

contradict Bishop Jones's under oath statements that he did not intend, authorize, or request public dissemination and that he first learned of a leak when this lawsuit was filed.

### C. Bishop Marc Steele's Declaration [EXHIBIT 5]

Bishop Steele confirmed the recording was publicly accessible almost immediately. Bishop Steele states he was first notified by an ACNA deacon about Bishop Jones's accusations within twelve hours of the recorded and published Teams meeting. [Exh. 5 at ¶ 4] He was sent a YouTube link to the full video-recorded meeting, and the link showed that the video had been published by and on JAFC's YouTube channel, "Anglican Chaplains - JAFC." [*Id.* at ¶¶ 5 & 6] Bishop Steele explained the significance of how the posting was made:

> On YouTube, videos can be posted either "Private," "Public" or "Unlisted." If "Private," the video is not publicly accessible. If "Public," the video is both publicly accessible and shown on the "videos" tab of the YouTube Channel that posts it. If "Unlisted," the video is publicly accessible, but does not appear in the list of videos on the homepage of the particular YouTube Channel that posted it. The Teams meeting at issue was posted by the JAFC as "Unlisted" such that it would be available to the general public but would not appear in the list of prior posted videos on the JAFC's YouTube Channel homepage. [*Id.* at ¶ 8]

He further confirmed: "I can and do confirm, from my own personal knowledge, that the Teams meeting, in full and with the statements concerning Bishop Dobbs, was publicly posted by the JAFC on its official YouTube Channel shortly after the meeting occurred." [*Id.* at ¶ 9]

This evidence refutes the notion that the meeting was kept confidential to the invited group. It was made available to the general public through JAFC's official YouTube channel by the JAFC almost immediately after the meeting occurred.

### D. Father Dan Morrison's Declaration [EXHIBIT 6]

Father Morrison's Declaration and accompanying hard documentary proof indisputably show Defendants have not been truthful to this Court.

He confirms the public posting was done by him in his role as the JAFC's Communications Director and as part of the JAFC's communications strategy. [Exh. 6 at ¶ 5 & 7] He states that, until October 4, 2025, he served as Communications Director of the JAFC under Bishop Jones. [*Id.* at ¶ 1] He further states that as former Communications Director, he had access to and handled posting on JAFC's official YouTube channel, "Anglican Chaplains - JAFC." [*Id.* at ¶ 4]

Critically, he states: "In my role as JAFC Communications Director, I publicly posted to the JAFC's YouTube Channel the 'All Hands' Teams meeting that included statements about Bishop Julian M. Dobbs that are referenced in his Complaint in this Court" and that he did so at the explicit instruction of Bishop Jones." [*Id.* at ¶ 5 & 6] And that this was within hours of the meeting's occurrence. [*Id.* at ¶ 6]

Father Morrison also confirmed and corroborated Father McElrath's recollection of the pre- and post-meeting internal discussions of the JAFC's leadership, including Bishop Jones:

> I was also part of discussions involving JAFC's Senior Leadership, including Bishop Jones, both before and after the Teams meeting in which it was specifically discussed, and all agreed, that we would both record the Teams meeting and make the recording publicly available for the purpose of allowing Bishop Jones and the JAFC to inform the public of their narrative concerning the Godly Admonition given to Bishop Jones by Archbishop Wood. [*Id.* at ¶ 7]

And most importantly, Father Morrison's testimony cannot be meaningfully disputed as he provided contemporaneous documentary proof (text messages with Bishop Jones and the JAFC's Ven. Kenneth Gillespie, as well as the public statement posted to the JAFC's official website that provided direct links to the YouTube video). [*Id.* at ¶ 10 and Exhibits 6A, 6B & 6D thereto]

This evidence directly contradicts Bishop Jones's Declaration and Defendants' statements in Motion filing with indisputable proof. According to both Father Morrison and Father McElrath, public dissemination was discussed and agreed upon before and after the meeting, by JAFC senior leadership including Bishop Jones. Finally, to be sure, Father Morrison further confirmed he has

not done anything with the JAFC's YouTube Channel since he resigned (also confirmed with contemporaneous text messages). [*Id.* at ¶ 8 & 9 and Exhibit C]

Father Morrison's evidence also shows (1) Bishop Jones lied when he declared, under penalty of perjury, that he was not aware of the public posting until Bishop Dobbs' filed his Complaint (in addition to it not having been his (Bishop Jones') intent to do so), and (2) the doubling-down by Defendants in their counsel's heavy-handed letter [Exh. 2] was nothing more than further untrue statements and bullying attempts – Fr. Morrison did not, after leaving JAFC's employ, publish the statements without the knowledge and consent of Bishop Jones and JAFC.

**E. Undersigned Counsel's (Marc J. Mandich) Declaration [EXHIBIT 3]**

The undersigned's Declaration confirms the video remained publicly accessible on the JAFC's YouTube channel in August 2026 and that Defendants' counsel was notified, as a courtesy, that their Motion was based on a falsehood. [*Id.* at ¶ 4 & 5] The undersigned accessed the YouTube link identified in Bishop Steele's declaration on August 14 and August 15, 2026, and the entire Teams meeting remained available and publicly posted as "Unlisted." [*Id.* at ¶ 4]

The undersigned further attests that, after defense counsel Barry Black sent a spoliation letter claiming the video was posted by ACNA personnel, the undersigned confirmed that Father Morrison was JAFC's Communications Director when he posted the video, he published it on instruction from Bishop Jones, and that he later reminded Defendants about their various communications channels and notified them that he would no longer utilize them. [*Id.* at ¶ 6] By August 17, 2026, the video was no longer available and displayed the message, "This video has been removed by the uploader," which directly disputes the claim in counsel's letter that Fr. Morrison (thus, the ACNA) controlled the account and, as such, *Plaintiff* must take it down. [*Id.* at ¶ 7] This was obviously untrue as Defendants took it down not long after counsel's letter.

The undersigned also stated that on August 14, 2026, he had a third-party court reporting service memorialize access to the video on JAFC's official YouTube channel, and confirmed: "I can and do confirm, from my own personal knowledge, that the Teams meeting, in full and with the statements concerning Bishop Dobbs, was publicly posted on the JAFC's official YouTube Channel at least until August 15, 2026." [*Id.* at ¶¶ 8 & 9] The video recorded by the third-party service is included herewith as Exhibit 1.

This evidence is important for Rule 11 purposes because Defendants' counsel had notice, before this motion, that the video was publicly available on JAFC's own YouTube channel. Defendants and counsel thus cannot, without violating their oaths and duties to this Court, maintain the factual contention the meeting was confidential and never intended for public dissemination.

## V. THE FALSE CONFIDENTIALITY NARRATIVE IS CENTRAL TO DEFENDANTS' MOTION TO DISMISS

This is not a collateral factual dispute. The asserted confidentiality of the Teams meeting is one of the principal factual predicates for Defendants' Motion to Dismiss. Defendants ask the Court to view the defamatory statements as protected because they were allegedly made in a closed, private, internal church meeting. They characterize the statements as communications to Bishop Jones's own clergy, within a confidential ecclesiastical setting, not directed to the public. They then use that characterization to argue ecclesiastical abstention, litigation privilege, and that dismissal is required under Rules 12(b)(1) and 12(b)(6).

But if Bishop Jones told the meeting participants he wanted the information "out there" and wanted the people he was discussing "exposed for the liars they are," if the meeting was recorded with the intent that it be disseminated publicly, if JAFC leadership agreed to make it public, if Bishop Jones knew and agreed that the recording would be distributed publicly, and if the JAFC itself publicly posted it to JAFC's official YouTube channel (as the indisputable proof

included herewith shows), then Defendants' factual premise collapses. The defamatory statements were not confined to a confidential clergy meeting. They were made in a recorded meeting that JAFC intended to publicize and did publicize. To state otherwise is a fraud upon this Court.

Rule 11 does not permit a party to present a factual narrative to the Court while ignoring evidence that directly disproves it. Nor does Rule 11 permit counsel to continue advocating a factual contention after learning that it is false.

## VI. SANCTIONS ARE WARRANTED

The Court should find that Defendants and their counsel violated Rule 11(b)(3) by presenting factual contentions that lacked evidentiary support and are categorically false: namely, that the Teams meeting was confidential, closed, private, internal, not directed to the public, not intended for public dissemination, and first "leaked" outside the invited group without Bishop Jones's or the JAFC's knowledge or authorization.

The record supports a finding that these factual contentions were false when made. At minimum, they were presented without the reasonable inquiry Rule 11 requires. Bishop Jones had personal knowledge of whether he and JAFC leadership intended to record and publicize the meeting. His own statements during the meeting and his contemporaneous text messages show he wanted the information "out there" and wanted Bishop Dobbs and others "exposed for the liars they are." Fr. McElrath and Fr. Morrison state that Bishop Jones and JAFC leadership agreed to public dissemination. Bishop Steele, Fr. Morrison and the undersigned confirm the JAFC publicly posted the recording on its official YouTube channel. Undersigned counsel further confirms Defendants' local counsel was sent the public JAFC YouTube link before the video was removed and conveyed Plaintiffs' position to his co-counsel, Barry Black, who – instead of honoring his duty to retract the falsehood – doubled down thereupon and attempted to strong arm and bully.

The appropriate sanction should be directed to deterrence *and punishment*. Here, the central sanction should be striking Defendants' Motion to Dismiss. The false confidentiality narrative is not a stray assertion. It is integral to Defendants' request for dismissal. Because Defendants' Motion to Dismiss materially relies on that factual predicate, striking the motion is a tailored sanction that addresses the precise litigation harm caused by the violation.

Award of attorney's fees and costs is also warranted. Plaintiff has been required to investigate the false confidentiality narrative, obtain and prepare declarations, preserve evidence of the public YouTube posting through third-party court reporting service, respond to Defendants' Motion, and prepare this Rule 11 motion. A fee-and-cost award limited to expenses directly resulting from the sanctionable conduct is consistent with Rule 11(c)(4) and the deterrent purpose of the rule.

Plaintiff does not at this time itemize additional sanctions beyond striking Defendants' Motion to Dismiss and awarding fees and costs. Instead, Plaintiff requests that, if the Court determines sanctions are warranted, the parties be permitted to brief the need for further, punitive sanctions.

## VII. REQUESTED RELIEF

For the foregoing reasons, Bishop Dobbs respectfully requests that the Court enter an order:

1. finding that Defendants and their counsel violated Federal Rule of Civil Procedure 11 by presenting and advocating false factual contentions concerning the alleged confidentiality of the September 22, 2025 Teams meeting;
2. striking Defendants' Motion to Dismiss;
3. awarding Plaintiff his reasonable attorney's fees and costs directly resulting from the sanctionable conduct, including fees and costs incurred investigating the false confidentiality assertions, responding to Defendants' Motion to Dismiss, preserving and presenting evidence of the public JAFC YouTube posting, and preparing this motion;

4. permitting the parties to submit further briefing on whether additional sanctions are warranted after the Court determines that Rule 11 has been violated; and
5. granting such other and further relief as the Court deems just and proper.

Respectfully Submitted,

*/s/ Marc J. Mandich*

MARC J. MANDICH (ASB-9346-H48E)
FRANCOIS M. BLAUDEAU (ASB-7722-D32F)
JAMES M. WOOTEN (ASB-1630-O40J)
ODEH J. ISSIS (ASB-4785-S83P)
SOUTHERN MED LAW
2762 B M MONTGOMERY ST, SUITE 101 HOMEWOOD, AL 35209
OFFICE: 205.564.2741
FAX: 205.649.6386
MARC@SOUTHERNMEDLAW.COM
FRANCOIS@SOUTHERNMEDLAW.COM
JIM@SOUTHERNMEDLAW.COM
ODEH@SOUTHERNMEDLAW.COM

COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this __11th___ day of September, 2026, I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will send notice of electronic filing to all counsel of record.

*/s/ Marc J. Mandich*
COUNSEL FOR PLAINTIFF